# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| STATE OF CONNECTICUT; | : |
| NANCY WYMAN, in her Official capacity as | : |
| the Comptroller of the State of Connecticut; | : |
| and KEVIN P. LEMBO, in his Official | :    CIVIL ACTION NO. |
| Capacity as Healthcare Advocate of the | : |
| State of Connecticut; STATE OF ILLINOIS, | : |
| by and through LISA MADIGAN, | : |
| Attorney General of the State of Illinois; | : |
| STATE OF CALIFORNIA, by and through | : |
| EDMUND G. BROWN JR., | : |
| Attorney General of the State of California; | : |
| STATE OF NEW JERSEY, by and through | : |
| ANNE MILGRAM, Attorney General of the | : |
| State of New Jersey;   COMMONWEALTH | : |
| OF MASSACHUSETTS, by and through | : |
| MARTHA COAKLEY, Attorney General of the | : |
| Commonwealth of Massachusetts; | : |
| STATE OF RHODE ISLAND by and through | : |
| PATRICK C. LYNCH | : |
| Attorney General of the State of Rhode Island; | : |
| STATE OF OREGON, | : |
| by and through JOHN R. KROGER, | : |
| Attorney General of the State of Oregon, | : |
|  | : |
|       Plaintiffs, | : |
|  | : |
|        v. | : |
|  | : |
| UNITED STATES OF AMERICA; | : |
| UNITED STATES DEPARTMENT OF | : |
| HEALTH AND HUMAN SERVICES; | : |
| MICHAEL O. LEAVITT, in his official | : |
| capacity as Secretary of Health and | : |
| Human Services, | : |
|  | : |
|       Defendants. | :    January 15, 2009 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.     At least since the United States Supreme Court's historic decisions in <u>Griswold v. Connecticut</u>, 381 U.S. 479 (1965) and <u>Eisenstadt v. Baird</u>, 405 U.S. 438 (1972), Americans have had the constitutional right to use contraception, without impermissible interference from the government.  For decades, many States have crafted legislation that carefully balances that right, including more broadly the health and privacy rights of all citizens, with the right of healthcare providers to abstain from performing certain medical procedures they find objectionable for moral, ethical, religious or other reasons.

2.     On December 19, 2008, just 32 days before President Bush's term expires, the United States Department of Health and Human Services ("HHS") promulgated one of several, highly controversial "midnight regulations."  The HHS regulation at issue in this case purports to protect a broad group of health care providers, including hospitals, health insurers, pharmacies and individuals from "discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for, abortion."  <u>See</u> 73 Fed. Reg. 78,098 (Dec. 19, 2008), 45 C.F.R. § 88.4(b)(1) (hereinafter, the "Regulation," attached hereto as Exhibit A).  The Regulation seeks to achieve these ends by authorizing HHS to terminate and/or compel the return of all HHS funds from states and local governments that violate its prohibition against such "discrimination."  <u>See</u> 73 Fed. Reg. 78,074.  For the plaintiff States, Connecticut, Illinois, California, New Jersey, Massachusetts, Rhode Island, Oregon the loss would total billions of dollars annually.

3.     The Regulation, which will become effective on January 20, 2009, the same day President-Elect Barack Obama is sworn in as the 44th President of the United States, fails to define the key term "abortion" and shrouds that term with new and unnecessary ambiguity such

that individuals are now permitted to define it as encompassing virtually all forms of contraception, including emergency contraception. Through its intentional vagueness, HHS is encouraging and empowering individuals to employ their own definition of abortion on an <u>ad hoc</u> basis, without providing advance notice to States, their employers or their patients. HHS's refusal to define abortion, or at a minimum expressly exclude contraception from its definition, is exacerbated by the history of this particular Regulation. The Regulation was preceded by a publicly circulated draft version of the Regulation (hereinafter, the "Draft Regulation," attached hereto as Exhibit B), which was leaked to the media prior to the time it was published as a proposed rule in the Federal Register. <u>See</u> Robert Pear, <u>Abortion Proposal Sets Condition on Aid</u>, N.Y. Times (July 15, 2008) (last checked January 14, 2009), <u>available at</u> http://www.nytimes.com/2008/07/15/washington/15rule.html; Christina Page, HHS Moves to Define Contraception as Abortion, RH Reality Check, <u>available at</u> http://www.rhrealitycheck.org/blog/2008/07/15/hhs-moves-define-contraception-abortion (last checked January 14, 2009) (providing a link to the full text of the Draft Regulation). The Draft Regulation expressly defined "abortion" as "any of the various procedures – including the prescription, dispensing, and administration of any drug or the performance of any procedure or any other action – that results in the termination of the life of a human being in utero between conception and birth, whether before or after implantation." <u>See</u> Draft Regulation, at 30.

4.     After the Draft Regulation was leaked, HHS published a proposed rule (the "Proposed Rule") in the Federal Register pursuant to the Administrative Procedures Act (the "APA"). <u>See</u> 73 Fed. Reg. 50,274 (Aug. 26, 2008). The Proposed Rule did not define the term "abortion." The uncertainty arising from this important change between the Draft Regulation and the Proposed Rule caused the public and public officials to submit comments to HHS

seeking clarification about how the term "abortion" would be defined or interpreted under the Proposed Rule.

5.    The Attorneys General of thirteen states sought clarification of the scope of the Proposed Rule and urged HHS to withdraw it on the grounds that it was, inter alia, "vague, [and] lacking in clear definition as to the health care procedures that may be withheld on moral or religious grounds." See September 24, 2008 Comments of Attorneys General of the States of Arizona, Connecticut, Illinois, Iowa, Maine, Maryland, Massachusetts, Montana, New Jersey, Oregon, Rhode Island, Utah and Vermont (attached hereto as Exhibit C). The Attorneys General highlighted the fact that the Proposed Rule's failure to define the term "abortion," together with the severe penalty of withdrawal of critical health care funding to a health care entity that violates the Proposed Rule -- even inadvertently -- could have "substantial and significant consequences for the provision of health care to many Americans." Id. The Attorneys General also cited, as an example of the Proposed Rule's failure to balance the interests of patients and health care providers and how it would undermine the "states' sovereign interests in ensuring that their health care policies are implemented fairly and uniformly throughout the state[s]," state laws requiring licensed health care facilities that provide emergency care to give female sexual assault victims information about, and access to, emergency contraception to avoid pregnancy. See id. at 2.

6.    Notwithstanding these and other similar comments from a host of entities affected by the Regulation, HHS failed to address these important concerns in the Regulation. Despite the fact that HHS evinced its intent to expand the definition of abortion to encompass contraception in its earlier Draft Regulation, it refused to dispel the new confusion regarding the scope of the term "abortion" in its responses to the comments or in the text of the Regulation.

Instead, HHS declined to adopt any definition for this key term or assuage concerns that it would interpret the term to encompass contraception, despite the fact that it has received requests for clarification on this precise point. In its responses, HHS acknowledged that the meaning of the term "abortion" is "highly controversial and strongly debated" and that it had received comments seeking clarification of "whether certain contraceptive methods or services that have the potential to terminate a fertilized egg after conception but before implantation" constitute an "abortion." See 73 Fed. Reg. 78,077. Nevertheless, HHS "decline[d] to add a definition of abortion to the rule," see id., and instead created additional ambiguity and empowered individuals to define "abortion" on a case by case basis. In so doing, HHS sought to achieve a policy objective indirectly that it could not achieve through lawful rulemaking or Congressional action. As set forth more fully below, HHS's refusal to clearly exclude contraception from the definition of "abortion" will have a severe chilling effect on the ability of the States to enforce their contraception laws.

7.      In addition to this chilling effect, the Regulation will also directly impede the enforcement of contraception laws because HHS also stated that the Regulation permits an individual health care provider to refuse to participate in virtually any medical procedure reasonably connected to an "abortion" without even informing a patient or employer that he or she is doing so. 73 Fed. Reg. 78,083. HHS has also concluded that the Regulation protects individuals not only from performing certain services, but also from providing patients with referrals for such services. See 73 Fed. Reg. 78,084. Thus, under the Regulation, a female victim of sexual assault seeking treatment at a licensed emergency health care facility may never learn that an individual healthcare provider has deprived her of her rights to receive factual and objective information about, and access to, emergency contraception under applicable state laws.

In addition to the obvious consequences such a rule would have for female sexual assault victims, under such circumstances neither the Plaintiffs nor a licensed healthcare facility will even know that such a facility has violated emergency contraception laws.

8.    By this suit, the Plaintiff States seek declaratory and injunctive relief preventing HHS from circumventing women's fundamental right to reproductive freedom and illegally usurping the States' sovereign powers to promote the general health and welfare of their citizens. By failing to define abortion and essentially delegating that crucial function to individuals and health care entities, HHS has clearly exceeded the scope of its statutory authority and undermined the ability of States to enforce their laws requiring healthcare entities to provide information about, and access to, contraception.  Because the Regulation violates the APA and the Spending Clause of the United States Constitution, Article I, section 8, it should be declared unconstitutional and unlawful and the Secretary should be preliminarily and permanently enjoined from enforcing it.

## JURISDICTION AND VENUE

9.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because this case involves a civil action arising under the Constitution of the United States, specifically Article I, section 8, clause 1 (the Spending Clause), and pursuant to 5 U.S.C. § 703.  Jurisdiction is also proper under section 2201 of title 28 of the United States Code because Plaintiffs seek a declaration of the rights of the parties to this action as set forth more fully below.  The Court may grant declaratory relief, injunctive relief, and any additional relief available, pursuant to 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. §§ 705 and 706.  HHS's promulgation of a final rule on December 19, 2008 is a final agency action within the meaning of the APA, 5 U.S.C. §§ 702, 704 and the Regulations are therefore judicially reviewable within the meaning of that statute.

Id., § 706. The Plaintiffs have exhausted their administrative remedies by timely submitting detailed comments on the Proposed Rule on September 24, 2008. Each of the Plaintiffs is a "person" within the meaning of 5 U.S.C. § 551(2), and is authorized to bring suit under the APA to challenge unlawful agency action. 5 U.S.C. § 702. Pursuant to 28 U.S.C. § 1391(e)(1)&(3), venue is proper because the plaintiffs State of Connecticut, Comptroller of the State of Connecticut, and Healthcare Advocate of the State of Connecticut all have offices in this judicial district. Venue is also proper in this judicial district because this is a civil action brought against an agency of the United States and officers and employees of the United States acting in their official capacities under color of legal authority, no specific real property is involved in this action and the State of Connecticut, as well as women residing in the State of Connecticut, will be adversely affected by the Regulation.

## PARTIES

10.    Plaintiff State of Connecticut is a sovereign state in the United States of America.

11.    Plaintiff Nancy Wyman is the Comptroller of the State of Connecticut. The Comptroller is aggrieved by the actions of the Defendants and has standing to bring this action because she is responsible for administering the State of Connecticut employee prescription drug insurance plan under Conn. Gen. Stat. § 38a-471(f).

12.    Plaintiff Kevin P. Lembo is the Healthcare Advocate of the State of Connecticut. The Healthcare Advocate is charged with assisting Connecticut residents who receive or attempt to receive services from managed care organizations in the State of Connecticut. See Conn. Gen. Stat. § 38a-1041. He is aggrieved by the actions of the Defendants because the Regulation empowers individuals to refuse to perform services or make referrals for emergency contraception without informing anyone, including their patients or employers. As a result, the

Regulation will interfere with the Healthcare Advocate's ability to: (a) provide complete and accurate information, referral and assistance to individuals about health services, including information about, and access to, emergency contraception; (b) pursue administrative remedies on behalf of health insurance consumers, including complaints about violations of Connecticut laws such as Conn. Gen. Stat. §§ 38a-503e & 38a-530e; and (c) monitor the implementation of state laws, regulations and policies relating to health insurance, such as Conn. Gen. Stat. §§ 38a-471(f), 38a-503e & 38a-530e. Id. The Healthcare Advocate is also aggrieved by the Regulation because he is authorized under Connecticut law to apply for and accept federal funds and grants, including HHS funds. See Conn. Gen. Stat. § 38a-1048.

13.    Plaintiff State of Illinois, by and through Lisa Madigan, Attorney General of the State of Illinois, is a sovereign state in the United States of America.

14.    Plaintiff State of California, by and through Edmund G. Brown Jr., Attorney General of the State of California, is a sovereign state in the United States of America.

15.    Plaintiff State of New Jersey, by and through Anne Milgram, Attorney General of the State of New Jersey, is a sovereign state in the United States of America.

16.    Plaintiff Commonwealth of Massachusetts, by and through Martha Coakley, Attorney General of the Commonwealth of Massachusetts, is a sovereign state in the United States of America.

17.    Plaintiff State of Rhode Island, by and through Patrick C. Lynch, Attorney General of the State of Rhode Island and Providence Plantations, its chief law officer, is a sovereign state in the United States of America.

18.    Plaintiff State of Oregon, by and through John R. Kroger, Attorney General of the State of Oregon, is a sovereign state in the United States of America.

19.    Plaintiffs Connecticut, Illinois, California, New Jersey, Massachusetts, Rhode Island, and Oregon are aggrieved by the actions of the federal Defendants and have standing to bring this action because of the injury to their sovereignty as states caused by the federal Regulation.    Each year, the States of Connecticut, Illinois, California, New Jersey, Massachusetts, Rhode Island, and Oregon receive billions of dollars in federal funds from HHS. Any Plaintiff State that fails to comply with the Regulation is subject to termination of HHS funding and return of HHS funds paid out in violation of health care conscience protection provisions under 45 C.F.R. Parts 74, 92, and 96, as applicable.

20.    The sovereign interests of Connecticut, Illinois, California, New Jersey, Massachusetts, Rhode Island, and Oregon are further aggrieved by the actions of the federal Defendants because the Regulation attempts to interfere with the Plaintiff States' exercise of their police powers.    Specifically, the Regulation attempts to deter the States from enforcing their own laws regulating the delivery of health care and the practice of medicine regarding contraception and the rights protected by state law for patients and hospital employers to be informed about a health care provider's choice about the provision of certain health care services. HHS promulgated the Regulation despite significant public comment from the Attorneys General of the Plaintiff States, including the September 24, 2008 letter attached hereto as Exhibit C and the August 4, 2008 and September 25, 2008 letters from Attorney General Brown of California, which identified numerous deficiencies in the proposed Regulations and urged that they not be adopted.  See Exhibit E hereto.

21.    The United States of America is named as a defendant in this action pursuant to section 702 of title 5 of the United States Code.

22.     Defendant Michael O. Leavitt, Secretary of Health and Human Services, is named in his official capacity as the Secretary of the Department of Health and Human Services, pursuant to section 702 of title 5 of the United States Code. Defendant Department of Health and Human Services is an executive department of the United States of America, pursuant to section 101 of title 5 of the United States Code and a federal agency within the meaning of section 2671 of title 28 of the United States Code. As such, it engages in agency action, within the meaning of section 702 of title 5 of the United States Code and is named as a defendant in this action pursuant to section 702 of title 5 of the United States Code.

## BACKGROUND FACTS

### Connecticut Laws and Regulations

23.     Connecticut has long strived to adopt laws and regulations that carefully balance the rights of its citizens to receive adequate healthcare with the rights of healthcare providers to abstain from participating in procedures to which they object. With respect to abortion, for instance, Connecticut has adopted regulations regulating how, when and by whom abortions may be performed. See Conn. State Agencies Regs. § 19-13-D54. Those regulations also specifically provide that "[n]o person shall be required to participate in any phase of an abortion that violates his or her judgment, philosophical, moral or religious beliefs." Id. at § 19-13-D54(f).

24.     More recently, in 2007, the Connecticut General Assembly addressed a dire and pressing issue facing victims of sexual assault in the State of Connecticut: the refusal by some licensed emergency healthcare facilities to provide female victims of sexual assault with information about, and access to, "emergency contraception." Emergency contraception, commonly known as the "morning-after pill" or "Plan B," is generally understood by the medical community, and in existing federal regulations, to mean the administration of a drug within a

certain period of time following sexual intercourse that prevents pregnancy by preventing a fertilized egg from implantation to a woman's uterus.

25.    After hearing extensive testimony from groups on both sides of the issue and engaging in a robust, public debate, the Connecticut General Assembly eventually passed a compromise bill that balanced the rights of victims of sexual assault with the interests of health care facilities in abstaining from medical procedures they might find objectionable.  The new law,  Public Act 07-24, Conn. Gen. Stat. § 19a-112e, provides that the standard of care for licensed health care facilities in Connecticut that provide emergency treatment to victims of sexual assault shall include: (1) providing each victim of sexual assault with medically and factually accurate and objective information relating to emergency contraception; (2) informing such victims of sexual assault of the availability of emergency contraception, its use and efficacy; and (3) providing emergency contraception to such victims at the facility upon request of such victim, provided that a licensed health care facility is not required to provide emergency contraception to a victim of sexual assault who has been determined to be pregnant through the administration of a pregnancy test approved by the United States Food and Drug Administration (the "FDA").  <u>See</u> Conn. Gen. Stat. § 19a-112e(b).  Importantly, the Public Act 07-24 also protects the interests of healthcare facilities that may find such procedures objectionable by permitting them to achieve compliance with these requirements by contracting with one or more independent providers.  <u>See</u> Conn. Gen. Stat. § 19a-112e(c).

26.    Unfortunately, Connecticut's emergency contraception law, which requires patients receive factually accurate and objective medical information, and other carefully crafted statutes regulating the availability of contraception, including emergency contraception, to Connecticut women, are now at risk of being perceived as effectively repealed by this Bush

administration midnight regulation that could deny Connecticut billions of dollars in federal funds if it seeks to enforce its laws. In addition to Conn. Gen. Stat. § 19a-112e, at least two other laws concerning the provision of contraception in the State of Connecticut are endangered by the new regulations. First, as set forth in a March 2, 2006 Formal Opinion of the Connecticut Attorney General, Conn. Gen. Stat. § 38a-471(f) permits the State's Comptroller to remove from the State's prescription drug insurance plan for state employees any pharmacy that refuses to dispense contraception, including, specifically, Plan B. See Formal Opinion of the Attorney General to the Honorable Nancy Wyman (Formal Opinion 2006-004, March 2, 2006) available at http://www.ct.gov/ag/cwp/ view.asp?A=1770&Q=310664 (last checked January 14, 2009). Second, Conn. Gen. Stat. §§ 38a-503e and 38a-530e provide that certain individual and group health insurance policies issued in Connecticut after October 1, 1999 that provide coverage for outpatient prescription drugs approved by the FDA shall not exclude coverage for prescription contraceptive methods approved by the FDA. Emergency contraception is a prescription contraceptive method that has been approved by the FDA.

### Illinois Laws and Regulations

27.    Like many other states, Illinois has a series of carefully-crafted laws and regulations that balance the health care rights of its residents with the rights of conscience of healthcare providers to abstain from providing certain types of medical care. The Regulation exposes these laws and regulations to needless legal challenges.

28.    For example, with respect to abortion, Illinois law protects the conscience rights of medical providers, while balancing the rights of women to reproductive health care, by providing that "[n]o physician, hospital, ambulatory surgical center, nor employee thereof, shall be required against his or its conscience declared in writing to perform, permit or participate in

any abortion. . . . If any request for an abortion is denied, the patient shall be promptly notified." 720 ILCS 510/13. The Regulation will upset the balance achieved by this statute by eliminating the need for a written declaration of conscience and eliminating the requirement that a patient be promptly notified when her medical provider declines to perform an abortion.

29.    Illinois also has a series of laws addressing the rights of its residents to access legal contraceptives, including emergency contraception. One statute, 215 ILCS 5/356z.4, mandates that all individual and group health insurance policies that include prescription drug coverage include coverage for outpatient contraceptive drugs and services with no additional charges or limitations. The Regulation allows Illinois insurance providers to argue that this statute has been preempted by federal law.

30.    Another Illinois statute, 410 ILCS 70/2.2, is designed to reduce the trauma of rape by ensuring that sexual assault survivors receive medically and factually accurate written and oral information about emergency contraception. To that end, all Illinois hospitals that provide services to sexual assault survivors are required to develop a protocol to ensure the delivery of that information. Id. See also Ill. Admin. Code title 77 §545 (regulations implementing 410 ILCS 70). Under the Regulation, Illinois' ability to enforce this statute and ensure that the rights of sexual assault survivors are protected will be undermined.

31.    The Illinois Administrative Code also includes detailed provisions that balance the rights of pharmacists to object to dispensing contraceptives, including emergency contraception, with the rights of the women of Illinois to have all lawful prescriptions filled. Ill. Admin. Code title 68, §1330.91. Among other things, the Illinois regulation requires that a pharmacy offer remote medication order processing, in the event that no pharmacist on-site will

dispense contraceptives, and requires pharmacies to display a notice of rights regarding the dispensation of contraceptives. Id. These provisions are undermined by the Regulation.

### California Laws and Regulations

32.     Like the other Plaintiff States, California has a statutory scheme that protects both religious freedom and a woman's right to appropriate health care.  In addition, the California Supreme Court has clearly established that the right to freely exercise one's religion is not violated by laws ensuring full and equal access to health care.  See, North Coast Women's Care Medical Group, Inc. v. San Diego County Superior Court, 44 Cal.4th 1145 , 189 P.3d 959, 81 Cal.Rptr.3d 708 (2008); Catholic Charities of Sacramento, Inc. v. Superior Court, 32 Cal.4th 527, 10 Cal.Rptr.3d 283, 85 P.3d 67 (2004).  California's carefully crafted balance, however, is jeopardized by the Regulation and the overbroad application that it invites.  For example, California law provides that no physician, nurse, or any other person employed or with staff privileges at a hospital, facility, or clinic shall be required "to directly participate in the induction or performance of an abortion" or be subject to any penalty or discipline for refusing to participate in an abortion, "if the employee or other person has filed a written statement with the employer or the hospital,  facility, or clinic indicating a moral, ethical, or religious basis for refusal to participate in the abortion." Cal. Health and Safety Code § 123420.  By not requiring a covered medical practioner to provide written notice to the employer or medical facility that she will refuse to participate in certain procedures, the Regulation undermines a very important patient protection afforded under California law.

33.     Similarly, California law allows a pharmacist to refuse, on ethical, moral, or religious grounds, to dispense a drug or device pursuant to an order or prescription, but only if he or she "has previously notified his or her employer, in writing, of the drug or class of drugs to

which he or she objects, and the . . . employer can, without creating undue hardship, provide a reasonable accommodation of the . . . objection." Cal. Bus. & Prof. Code § 733, subd. (b)(3). In addition, the employer must establish protocols that ensure that the patient has timely access to the prescribed drug or device despite the pharmacist's refusal to dispense the prescription. Id. Again the Regulation, contrary to California state law, does not require written notice to the employer or medical facility of the drug or class of drugs to which the pharmacist objects, an omission made all the more critical because of the employer's legal obligation to nonetheless provide timely access to the proscribed drug or device.

34.    California law also requires that a female victim of sexual assault shall be provided with "the option of postcoital contraception by a physician or other health care provider and that "[p]ostcoital contraception . . . be dispensed by a physician or other health care provider upon the request of the victim." Cal. Penal Code § 13823.11, subds. (e) and (g)(4). By creating ambiguity as to whether emergency contraception may come within the meaning of the word "abortion," the Regulation threatens the ability of the State of California to ensure that women who have been raped have access to all medical treatment options to which they are legally entitled.

### New Jersey Laws and Regulations

35.    Like the other Plaintiff States, New Jersey has enacted a number of laws that afford its residents access to critical reproductive healthcare services, including contraception. New Jersey has also recognized the rights of healthcare providers and facilities to refrain from performing or providing certain services including abortion. The delicate balance struck among the various statutory schemes is imperiled by the Regulation.

36.    With respect to abortion, New Jersey law protects the conscience rights of

medical providers by providing that no person shall be required to perform or assist in the performance of an abortion..." <u>N.J.S.A.</u> 26:65A-1. Similarly, "no hospital or other health care facility shall be required to provide abortion … services or procedures." <u>N.J.S.A.</u> 2A:65A-2.

37.    New Jersey law requires general hospitals and satellite emergency departments to provide sexual assault victims with "medically and factually accurate and objective oral and written information about emergency contraception," to orally inform each victim of her option to be provided emergency contraception at the health care facility; and to provide emergency contraception to the victim, upon her request, unless it is contraindicated or the victim is pregnant. <u>N.J.S.A.</u> 26:2H-12.6c. Because of its failure to define "abortion," thus creating the real potential for its application to emergency contraceptives, the Regulation could effectively eviscerate this statute, threatening New Jersey's ability to ensure that women who are victims of sexual assault have access to all treatment options to which they are legally entitled.

38.    New Jersey also requires all health insurers and the State Health Benefits Plan to cover prescription female contraceptive drugs, including emergency contraceptives, in the same way that other prescription drugs are covered. <u>P.L.</u> 2005, <u>c.</u> 251. Interpreting the Regulation to apply to contraceptives would effectively repeal this statute.

39.    New Jersey law requires pharmacies to fill all lawful prescriptions, including those for emergency contraceptives, regardless of any conflicts of employees to filling prescriptions due to sincerely held moral, philosophical, or religious beliefs. <u>N.J.S.A.</u> 45:14-67.1a. The Regulation also endangers this provision.

### Massachusetts Laws and Regulations

40.    Massachusetts has carefully crafted its laws and policies to protect both access to reproductive health care and the right of health care providers to not participate in certain

services that they find objectionable.  For example, Massachusetts law specifically provides that "[a] physician or any other person who is a member of or associated with the medical staff of a hospital or other health facility or any employee of a hospital or other health facility" who states in writing that the performance or participation in the performance of an abortion is against their moral or religious beliefs will not be required to participate in the procedure.  Mass. Gen. Laws, c. 112, § 12 I.  The Regulation undermines the balance created in the law by eliminating the requirement for providers to declare in writing and inform their employer of their conscience objection.

41.     Massachusetts, like many other states, has a law to protect the ability of rape survivors and victims of sexual assault to receive information about and access to emergency contraception.  Mass. Gen. Laws c. 111, § 70E.  The Regulation severely interferes with Massachusetts' ability to enforce this law and provide protection to sexual assault victims.

42.     Similarly, Massachusetts laws require insurers and health care providers that provide coverage for outpatient prescription drugs and services to provide coverage for outpatient prescription contraceptive drugs and services under the same terms or conditions. Mass. Gen. Laws c. 175, § 47W; Mass. Gen. Laws c. 176A, § 8W; Mass. Gen. Laws c. 176B, § 4W.  The Regulation severely interferes with Massachusetts' ability to enforce these laws and ensure needed access to reproductive health care.

### Rhode Island Laws and Regulations

43.     With respect to abortion, Rhode Island law protects the conscience of health care providers, while balancing the rights of women to reproductive health care, by providing that "[a] physician or any other person who is a member of or associated with the medical staff of a health care facility or any employee of a health care facility in which an abortion …is scheduled,

and who shall state in writing an objection to the abortion … on moral or religious grounds, shall not be required to participate in the medical procedures which result in the abortion or sterilization, and the refusal of the person to participate in the medical procedures shall not form the basis for any claim of damages on account of the refusal or for any disciplinary or recriminatory action against the person." R.I. Gen. Laws §23-17-11. The Regulation will upset the balance achieved by this statute by eliminating the need for written declaration stating an objection on religious or moral grounds.

44.    Rhode Island has a series of laws addressing the rights of its residents' access to legal contraceptives (with the exception of prescription drug RU 486). R.I. Gen. Laws § 27-18-57 (Accident and Sickness Insurance Policies), §27-19-48 (Nonprofit Hospital Service Corporations), §27-20-43 (Nonprofit Medical Service Corporations) and §27-41-59 (Health Maintenance Organizations) provide that "[e]very individual or group health insurance contract, plan, or policy that provides prescription coverage and is delivered, issued for delivery, or renewed in this state shall provide coverage for F.D.A. approved contraceptive drugs and devices requiring prescription"; provided that nothing is deemed to mandate or require coverage for the prescription drug RU 486. These statutes permit an insurance company, hospital service corporation, medical service corporation and a health maintenance organization to issue to a religious employer an individual or heath insurance contract, plan or policy that excludes coverage for prescription contraceptives which are contrary to the religious employer's bona fide religious belief. Any religious employer invoking this section must "provide written notice to prospective enrollees prior to enrollment with the plan, listing the contraceptive health care services the employer refuses to cover for religious reasons." The Regulation effectively repeals these statutes.

### Oregon Laws and Regulations

45.    Oregon's statutes reflect a judicious balance between the rights of its citizens to access health care services and the rights of health care providers to abstain from providing certain types of medical care. These Regulations substantially alter that balance.

46.    With respect to abortion, Oregon law protects the rights of physicians who choose not to "give advice with respect to or participate in any termination of pregnancy if the refusal to do so is based on an election not to give such advice or participate in such terminations and the physician advises the patient." Or. Rev. Stat. 435.485.    The statute further permits hospital employees and staff to not participate in termination of pregnancy "if the employee or staff member notifies the hospital" of their decision. The Regulation is contrary to state law to the extent it would permit physicians to choose not to advise the patient and not to inform their hospital employer of their decision.

47.    In 2007, the State of Oregon passed a law that assists women who are victims of sexual assault, by ensuring that they have information about, and access to, emergency contraception. Or. Rev. Stat. 435.254. "Emergency contraception" is defined as "the use of a drug or device that is approved by the United States Food and Drug Administration to prevent pregnancy after sexual intercourse." Or. Rev. Stat. 435.252(3).    Under Oregon's emergency contraception law, a hospital that treats a sexual assault victim is required to: (1) Provide written and oral information about emergency contraception to the victim; (2) Provide emergency contraception to the victim on request (unless it is medically contraindicated); (3) Have available written materials about emergency contraception in the hospital emergency department; and (4) Post a notice to inform sexual assault victims of their right to be provided emergency contraception at the hospital. Or. Rev. Stat. 435.254; Or. Admin. R. 333-520-0073(2).    If a

hospital fails to comply with these provisions, the Oregon Department of Human Services has the authority to issue civil penalties.

48.    Oregon will be unable to enforce its emergency contraception law without the threat of losing its considerable federal funding.  In addition, if hospitals do not comply with Oregon's emergency contraception law, sexual assault victims may be unaware of their rights under the law to be informed about, and obtain, emergency contraception.

## The Federal Regulation

49.    On December 19, 2008, HHS took final agency action when it caused the Regulation to be published as a final rule in the Federal Register.  In promulgating the Regulation, HHS purportedly sought to implement and enforce, pursuant to 5 U.S.C. § 301, three separate federal laws passed by Congress pursuant to its authority under the Spending Clause: the "Church Amendments," 42 U.S.C. § 300a-7; the "Public Health Service ('PHS') Act," 42 U.S.C. § 238n; and the "Weldon Amendment," Consolidated Appropriations Act, 2008, Public Law 110-161, Div. G, § 508(d), 121 Stat. 1844, 2209.  See 73 Fed. Reg. 78,072-78,074; 78,087.

50.    Section 88.3(b) of the Regulation provides that "[a]ny State or local government that receives federal funds appropriated through the appropriations act for the Department of Health and Human Services is required to comply with §§ 88.4(b)(1) and 88.5 of this part."  45 C.F.R. § 88.3(b).    Because the Plaintiffs receive federal funds appropriated through the appropriations act for HHS, Section 88.3(b) requires them to comply with Section 88.4(b)(1) of the Regulation.

51.    Section 88.4(b)(1) of the Regulation, in turn, provides that "[a]ny entity to whom this paragraph (b)(1) applies shall not subject any institutional or individual health care entity to

discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for, abortion." 45 C.F.R. § 88.4(b)(1).

52.     The Regulation defines a "Health Care Entity" as including "an individual physician or other health care professional, health care personnel, a participant in a program of training in the health professions, an applicant for training or study in the health professions, a post graduate physician training program, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, laboratory or any other kind of health care organization or facility.  It may also include components of State or local governments."  45 C.F.R. § 88.2. (Emphasis added).

53.     Thus, by its terms, the Regulation purports to prohibit the Plaintiff States from subjecting any "hospital," "health insurance plan" or "other kind of health care organization or facility" to "discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for, abortion." The Regulation further provides that HHS recipients that fail to comply with the Regulation will be subject to termination of HHS funding and return of HHS funds paid out in violation of health care conscience protection provisions under 45 C.F.R. Parts 74, 92, and 96, as applicable.  See 73 Fed. Reg. 78,074.  For the States of Connecticut, Illinois, California, New Jersey, Massachusetts, Rhode Island, and Oregon, the loss would be billions of dollars annually.

54.     The Regulation does not define "abortion."  Section 88.1 of the Regulation, however, provides that its provisions "are to be interpreted and implemented broadly to effectuate their protective purposes." 45 C.F.R. § 88.1.  Moreover, during the rulemaking process, the Attorneys General of thirteen states and the California Attorney General, as well as other members of the public, specifically noted that the Proposed Rule failed to define the term

"abortion" and that, as a result, it was unclear whether the Proposed Rule would prohibit recipients of HHS funds from taking appropriate administrative or other actions to ensure the availability of contraception. Indeed, the Attorneys General's joint comments specifically cited Connecticut's emergency contraception law as an example of the kinds of laws that required clarification from HHS.

55.    In its published responses to the public's comments, HHS expressly acknowledged receiving comments seeking clarification of "whether certain contraceptive methods or services that have the potential to terminate a fertilized egg after conception but before implantation" constitute an "abortion," see 73 Fed. Reg. 78,077, but "decline[d] to add a definition of abortion to the rule." Id. While also acknowledging that the meaning of the term "abortion" is "highly controversial and strongly debated," see id., HHS, nevertheless, bluntly asserted, without explanation, that it can enforce the Regulation without defining "abortion," just as it has supposedly enforced the Congressional funding restrictions it now proposes to implement through the Regulation. Id.

56.    In another section of its published responses, HHS noted that "several comments expressed concern that the proposed rule would limit access to emergency procedures, such as emergency contraception for rape victims, surgery for ectopic pregnancies, and other services." See 73 Fed. Reg. 78,080. In its response, HHS again refused to clarify whether the Proposed Rule applied to contraception. Id. at 78,080-78,081. Instead, HHS responded that it "continues to support efforts to make safe and effective contraceptives and family planning services available to women -- and men -- who cannot otherwise afford them." Id. at 78,081. According to HHS, however, the "regulation will ensure that such programs are carried out in a way that is consistent with federal health care conscience protection laws." Id.

57.    HHS also noted that "[s]ome comments expressed concern that this rule could interfere with existing state laws that regulate contraceptive coverage mandates in insurance policies, access to emergency contraception, and access to birth control at pharmacies. Commenters were also concerned that this regulation would impact a State's ability to enforce these laws and upset the balance that state and federal laws already strike between the religious freedom of healthcare providers and a patient's need to access health care services."  73 Fed. Reg. 78,088.  In response, HHS not only refused to clarify the Proposed Rule, but specifically noted that HHS "is aware that some States may have laws that, if enforced, depending on the factual circumstances, might violate these federally protected rights. . . ."  Id.

58.    Furthermore, HHS's responses to comments submitted by other interested members of the public make it clear that the Regulation will severely undermine the States' ability to enforce their contraception laws.  In response to comments seeking the adoption of guidelines for the communication of a provider's individual conscience objections to employers and patients, HHS "concluded that it was neither feasible nor prudent . . . to provide specific guidance on methods and means for such communication given the vast array of circumstances and settings in which communications regarding conscience are likely to take place."  73 Fed. Reg. 78,083.  In response to other comments arguing that providers who object to certain services should be required to provide a patient with a referral for that service, HHS concluded that it could not enforce such a referral requirement without violating certain provisions of the Weldon Amendment and PHS Act § 245.  See 73 Fed. Reg. 78,084.

59.    The net effect of the HHS responses described in the preceding paragraph is that individuals will be emboldened to refuse to perform virtually any medical procedure they find personally objectionable, including the provision of information about, or the actual

23

administration of, contraception, without even informing their employers or patients that they are exercising their supposed rights under the Regulation. For example, a female victim of sexual assault seeking treatment at a licensed emergency health care facility may, therefore, never learn that an individual healthcare provider has deprived her of her right under applicable state statutes, to receive factual and objective information about, and access to, emergency contraception. In addition, a licensed healthcare facility seeking to comply with applicable state laws may be unable to detect instances in which an individual physician is causing the facility to violate state law. Thus, even if the Plaintiffs elected to enforce their contraception laws, and thereby risk losing billions of dollars in federal funding, the Regulation would severely undermine their ability to enforce their own laws.

60. At least since the United States Supreme Court's historic decisions in <u>Griswold v. Connecticut</u>, 381 U.S. 479 (1965) and <u>Eisenstadt v. Baird</u>, 405 U.S. 438 (1972), Americans have had the constitutional right to use contraception, without impermissible interference from the government. In light of the language of the Regulation, the HHS responses to public comments, and the context in which the Regulation was promulgated (including the contents of the leaked Draft Regulation), it is clear that the Regulation impermissibly purports to prohibit the Plaintiff States from enforcing laws regulating the use, availability and coverage of emergency contraception. As such, the Regulation represents an illegal attempt to deter States from protecting the constitutional right of women who have been sexually assaulted to exercise their right to use contraception to avoid unintended pregnancies.

61. The Plaintiff States expect to receive billions of dollars in federal funding for the fiscal years 2009-2011 under the HHS appropriation act. These funds could be withheld from state agencies if HHS officials deem that a State has subjected any individual or institutional

health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage or, or refer for, abortion.  45 C.F.R. § 88.4(b)(1); 73 Fed. Reg. 78,098.

62.    As a result of the Regulation, before enforcing its emergency contraception laws, the Plaintiff States must consider the threat of massive cuts in federal funding and destruction of vital public health and safety programs.  Consequently, the Regulation will have a dramatic, chilling effect on the enforcement of state contraception laws and will likely embolden licensed health care entities to violate applicable state laws enacted to protect the fundamental constitutional right of women, including female sexual assault victims, to use contraception.

63.    By way of example, $3 billion in annual funding to the State of Connecticut from HHS is now in jeopardy.   A non-exhaustive list of the Connecticut programs that receive HHS funding is contained in the State of Connecticut Single Audit Reports for the Fiscal Year ended June 30, 2007. (Excerpts attached hereto as Exhibit D).  The vast majority of programs that received HHS funds are totally unrelated to "abortion" or "contraception," no matter how HHS might choose construe those terms. Id.   Other Plaintiff States receive similar, and in some instances, far greater amounts of HHS funds annually.

## FIRST COUNT

## VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT

### (Final Agency Action Exceeding Congressional Delegation of Authority)

64.    The allegations of paragraphs 1-33 are incorporated into this count as though fully set forth.

65.    In promulgating the Regulation, HHS purportedly acted pursuant to the "Church Amendments," 42 U.S.C. § 300a-7; the "Public Health Service ('PHS') Act," 42 U.S.C. § 238n;

and the "Weldon Amendment," Consolidated Appropriations Act, 2008, Public Law 110-161, Div. G, § 508(d), 121 Stat. 1844, 2209.  See 73 Fed. Reg. 78,072-78,074; 78,087.

66.    None of these laws authorizes HHS to withhold HHS federal funds from a State that subjects "any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for," see 45 C.F.R. § 88.4(b)(1), anything other than "abortion." Id.

67.    Nothing in the language of the Church Amendments, the PHS Act or the Weldon Amendment or the legislative history authorizes HHS to withdraw or withhold HHS funds from States because they mandate the availability of contraception, including emergency contraception.  These statutes' legislative histories do not support such an interpretation and, in fact, contravene the expansive interpretation of "abortion" this Regulation now authorizes.

68.    By promulgating the Regulation as it did, HHS has exceeded its statutory authority by threatening to withhold federal HHS funds from States for subjecting health care entities to "discrimination," based on those entities' refusal to provide, pay for, provide coverage of, or refer for contraception, as opposed to "abortions."

69.    HHS's promulgation of the Regulation was, therefore, arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of HHS's statutory authority and jurisdiction, and contrary to the Plaintiffs' constitutional rights, powers, privileges and immunities, all in violation of the APA.  See 5 U.S.C. § 706(2)(A),(B)&(C).

70.    The Plaintiff States will be irreparably harmed if enforcement of the Regulation is not enjoined because they will be deterred from exercising their sovereign police powers to enforce their laws regulating the use and availability of contraception to their citizens. Specifically, the States will be deterred from enforcing their laws through the loss of billions of

dollars in HHS funds otherwise appropriated to them for programs unrelated to abortion or this Regulation. In addition, the States' enforcement efforts will be directly undermined because HHS has stated that the Regulation empowers individuals to refuse to provide information about, access to, and referrals for, contraception without informing their patients or employers that they are so refusing.

## SECOND COUNT

## VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT

### (Failure to Adequately Respond to Significant Public Comments)

71. The allegations of Paragraphs 1-70 above are incorporated into this count as though fully set forth.

72. It is well settled that the APA requires agencies promulgating regulations to adequately address, with some precision, the major comments it receives from the public during the formal rulemaking process. See 5 U.S.C. § 553(c).

73. During the official comment period on the Proposed Rule, the Attorneys General of thirteen States, commented that the Proposed Rule was "vague, [and] lacking in clear definition as to the health care procedures that may be withheld on moral or religious grounds." (Exhibit C). Specifically, the Attorneys General noted that the Proposed Rule failed to define the term "abortion" and that it could, therefore, have "substantial and significant consequences for the provision of health care to many Americans." Id. The Attorneys General also commented that the Proposed Rule's failure to define "abortion" would undermine the "states' sovereign interests in ensuring that their health care policies are implemented fairly and uniformly throughout the state[s]. . . ." Id. at 2. The comments specifically noted that the Proposed Rule, as drafted, would conflict with state laws requiring health care facilities to give female sexual

assault victims information about, and access to, emergency contraception to avoid pregnancy, as an example of how the Proposed Rule would undermine the states' ability to protect the public health and safety of their citizens.  See id.

74.    The State of California separately commented that, among other deficiencies in the Regulation, the lack of a definition of "abortion" failed to "ensure that the term will not be improperly extended beyond the scope of the authorizing statutes and does not afford meaningful protection for a woman's access to other health care services, including those involving contraception and fertility treatments." September 25, 2008 letter from Edmund G. Brown Jr. to Office of Public Health and Science, Department of Health and Human Services (attached hereto as Exhibit E.)

75.    In publishing the final Regulation, HHS failed to adequately address these and other comments requesting a clear definition of the term "abortion" or, at a minimum, clarify that contraception did not fall with the definition.  As set forth above, this is particularly problematic in the circumstances of this case because, prior to the time the Proposed Rule was published, a Draft Regulation was leaked to the press, which provided a definition of "abortion" that expressly included contraception.

76.    Far from adequately addressing the comments, HHS exacerbated the problem by responding in a way that injected even more confusion into the question of whether the Regulation purports to prohibit States from enforcing their laws and regulations governing contraception.

77.    As set forth more fully in paragraphs 55-58 above, HHS: (1) expressly acknowledged receiving comments seeking clarification of "whether certain contraceptive methods or services that have the potential to terminate a fertilized egg after conception but

before implantation" constitute an "abortion," see 73 Fed. Reg. 78,077, but "decline[d] to add a definition of abortion to the rule." Id.; (2) noted that "several comments expressed concern that the proposed rule would limit access to emergency procedures, such as emergency contraception for rape victims, surgery for ectopic pregnancies, and other services," see 73 Fed. Reg. 78,080, but again refused to clarify whether the Proposed Rule applies to contraception, see id. at 78,080-78,081; and (3) not only refused to clarify whether the Proposed Rule covered contraception, but specifically noted that it was "aware that some States may have laws that, if enforced, depending on the factual circumstances, might violate these federally protected rights. . . ." Id. at 78,088 (emphasis added).

78.     HHS violated the APA's requirement that agencies adequately address and respond to significant public comments. HHS's promulgation of the Regulation was, therefore, arbitrary, capricious, an abuse of discretion, not in accordance with law, and contrary to the Plaintiff States' constitutional rights, powers, privileges and immunities, all in violation of the APA. See 5 U.S.C. §§ 553 and 706(2)(A)(B)&(D).

79.     The Plaintiff States will be irreparably harmed if enforcement of the Regulation is not enjoined because they will be deterred from exercising their sovereign police power to enforce their laws regulating the use and availability of contraception to their citizens. Specifically, the States will be deterred from enforcing their laws through the threat of the loss of billions of dollars in HHS funds otherwise appropriated to them for programs unrelated to abortion or this Regulation.  In addition, the States' enforcement efforts will be directly undermined because HHS has stated that the Regulation empowers individuals to refuse to provide information about, access to, and referrals for, contraception without informing their patients or employers that they are so refusing.

## THIRD COUNT

## VIOLATION OF THE SPENDING CLAUSE

### (Vagueness)

80.    The allegations of paragraphs 1-65 and 72-79 above are incorporated into this count as though fully set forth.

81.    Congress' spending power is not unlimited.  When "Congress desires to condition the State's receipt of federal funds, it 'must do so unambiguously . . ., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'"  South Dakota v. Dole, 483 U.S. 203, 207 (1987).

82.    To the extent that the Church Amendments, the PHS Act and/or the Weldon Amendment authorized HHS to promulgate this Regulation, those laws, as interpreted and implemented by the Regulation, violate the Spending Clause because the Regulation is vague and does not provide Plaintiff States with adequate notice of what action or conduct, if engaged in by the Plaintiff States, will result in the withholding of federal funds.  Consequently, the States cannot make a knowing choice about whether to comply with the Regulation or forego federal funding by taking action or engaging in conduct that could be deemed discrimination within the meaning of the Regulation.

83.    The Regulation is vague and will require the Plaintiff States to speculate as to what conduct will violate the funding condition.  It is unclear, for instance, particularly in light of the leaked Draft Regulation and HHS's responses to the Attorneys General comments, whether enforcement of applicable contraception laws against a health care entity, which refuses to comply with those laws, would constitute "discrimination" within the meaning of the Regulation.

84.     Because the Plaintiff States are unable to determine with any reasonable level of certainty whether enforcement of their laws would constitute a violation of the Regulation's conditions, they cannot make a knowing choice about whether to forego enforcement. Additionally, because of the potential loss of HHS funds to the Plaintiff States and the uncertainty about what is meant by "abortion," the Regulation creates a severe chilling effect on State officials' willingness to take action against health care entities that refuse to comply with these state laws.

85.     The Plaintiff States will be irreparably harmed if enforcement of the Regulation is not enjoined because they will be deterred from exercising their sovereign police power to enforce their laws regulating the use and availability of contraception to their citizens. Specifically, the Plaintiff States will be deterred from enforcing their laws through the loss of billions of dollars in HHS funds otherwise appropriated to them for programs unrelated to abortion or this Regulation. In addition, the Plaintiff States' enforcement efforts will be directly undermined because HHS has stated that the Regulation empowers individuals to refuse to provide information about, access to, and referrals for, contraception without informing their patients or employers that they are so refusing.

## FOURTH COUNT

## VIOLATION OF THE SPENDING CLAUSE

### (Unrelatedness)

86.     The allegations of paragraphs 1-85 of the third count are incorporated into this count as though fully set forth.

87.     To be valid under the Spending Clause, federal funding conditions must be rationally related to the federal interest in the particular program that receives federal funds.

31

88.    As set forth in paragraph 63, various State programs receive billions of dollars in funding under the HHS appropriations act, and there is no rational relationship between the Regulation and the federal interest in these programs.  (See ¶ 63 and Exhibit D).

89.    By effectively preventing the Plaintiff States from enforcing laws and regulations protecting the reproductive rights of women, including requirements that victims of sexual assault receive information about, and access to, emergency contraception, the Regulation is even further removed from the goals and federal interests identified in the programs described in paragraph 63.

90.    Therefore, to the extent that the Church Amendments, the PHS Act and/or the Weldon Amendment authorized HHS to promulgate the Regulation as it did, those laws, as interpreted and implemented by the Regulation, violate the Spending Clause because the restrictions they impose are not rationally related to the affected national projects or programs.

91.    The Plaintiff States will be irreparably harmed if enforcement of the Regulation is not enjoined because they will be deterred from exercising their sovereign police power to enforce their laws regulating the use and availability of contraception to their citizens. Specifically, the Plaintiff States will be deterred from enforcing their laws through the loss of billions of dollars in HHS funds otherwise appropriated to them for programs unrelated to abortion or this Regulation.  In addition, the Plaintiff States' enforcement efforts will be directly undermined because HHS has stated that the Regulation empowers individuals to refuse to provide information about, access to, and referrals for, contraception without informing their patients or employers that they are so refusing.

## FIFTH COUNT

## VIOLATION OF THE SPENDING CLAUSE

### (Coercion)

92.     The allegations of paragraphs 1-91 of the fourth count are incorporated into this count as though fully set forth.

93.     Under the Spending Clause, Congress may not condition the receipt of federal funds in such a way as to leave the States with no practical alternative but to comply with the federal restrictions.  Thus, Congress may not offer financial inducements that are so coercive as to pass from pressure to compulsion.

94.     To the extent that the Church Amendments, the PHS Act and/or the Weldon Amendment authorized HHS to promulgate the Regulation as it did, those laws, as interpreted and implemented by the Regulation, violate the Spending Clause because they force Plaintiff States to either forego enforcement of state laws or to enforce such laws at the risk of causing the Plaintiff States to lose billions of dollars in federal funds during one of the worst ever fiscal crises.  Moreover, the Regulation forces the Plaintiff States to surrender their sovereign police powers.  The Regulation imposes this risk on the Plaintiff States even though the regulation of health care and the practice of medicine are generally reserved to the States in the sound exercise of their police powers.  The Regulation's funding restriction is so broad and severe as to leave the Plaintiff States with no choice but to accede to HHS's dictates and surrender to the federal government the exercise of the States' police powers in this important area of public health.

95.     The Regulation's coercive restriction is beyond the scope of Congress's or HHS's enumerated powers.  Because no provision of the United States Constitution vests Congress or

HHS with the power to directly enact the restrictions in the Regulation as law, the Regulation violates the Spending Clause of the United States Constitution.

96.    The Plaintiff States will be irreparably harmed if enforcement of the Regulation is not enjoined because they will be deterred from exercising their sovereign police power to enforce their laws regulating the use and availability of contraception to their citizens. Specifically, the Plaintiff States will be deterred from enforcing their laws through the loss of billions of dollars in HHS funds otherwise appropriated to them for programs unrelated to abortion or this Regulation.  In addition, the Plaintiff States' enforcement efforts will be directly undermined because HHS has stated that the Regulation empowers individuals to refuse to provide information about, access to, and referrals for, contraception without informing their patients or employers that they are so refusing.

## SIXTH COUNT

## DECLARATORY RELIEF (IN THE ALTERNATIVE)

97.    The allegations of paragraphs 1-96 of the fifth count are incorporated into this count as though fully set forth.

98.    An actual controversy exists in that Plaintiffs contend that if the enforcement of facially neutral laws designed to protect the health and welfare of their residents were deemed to constitute a violation of the Regulation, the Regulation would be unconstitutional and a violation of the APA.  The Regulation does not clearly exclude contraception from the meaning of the term "abortion," but rather was promulgated in such a way that it facially applies to some forms of contraception.  Because the Regulation expressly authorized HHS to withhold federal funds from the States for violations of the Regulation, Plaintiff States face the imminent threat of losing federal HHS funds under the Regulation if the Plaintiffs enforce these laws.

99.    A determination of the meaning of the Regulation is necessary so that the Plaintiffs will know what actions state officials may undertake without subjecting themselves and their state agencies to the potential loss of billions of dollars in HHS funding. A declaration of the rights of the parties and the lawfulness of the Regulation is appropriate pursuant to 28 U.S.C. § 2201.

100.    Plaintiffs are entitled to a declaration that the Regulation does not empower HHS to withhold HHS funds from state agencies merely because the Plaintiffs enforce facially-neutral laws designed to protect the health and welfare of their residents, or any other law requiring health care entities to provide information about, and access to, contraception.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs State of Connecticut, Nancy Wyman, in her official capacity as the Comptroller of the State of Connecticut, Kevin P. Lembo, in his official capacity as Healthcare Advocate of the State of Connecticut; State of Illinois, by and through Lisa Madigan, Attorney General of the State of Illinois; State of California, by and through Edmund G. Brown Jr., Attorney General of the State of California; State of New Jersey, by and through Anne Milgram, Attorney General of the State of New Jersey; Commonwealth of Massachusetts, by and through Martha Coakley, Attorney General of the Commonwealth of Massachusetts, State of Rhode Island, by and through Patrick C. Lynch, Attorney General of the State of Rhode Island; State of Oregon, by and through John R. Kroger, Attorney General of the State of Oregon, pray for judgment against each of the Defendants as follows:

1.    As to the first count, for a declaration that the Regulation is arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of HHS's statutory authority and jurisdiction, and contrary to the Plaintiffs' constitutional rights, powers, privileges and

immunities, all in violation of the APA, see 5 U.S.C. § 706(2)(A),(B)&(C), because HHS exceeded its Congressional delegation of authority by not clearly excluding contraception from the definition of "abortion" in the Regulation and permitting individuals to determine the definition of abortion on an *ad hoc* basis;

2.      As to the second count, for a declaration that the Regulation is arbitrary, capricious, an abuse of discretion, not in accordance with law, and contrary to the Plaintiffs' constitutional rights, powers, privileges and immunities, all in violation of the Administrative Procedures Act, see 5 U.S.C. § 706(2)(A)&(B), because HHS failed to respond adequately to the public comments it received seeking clarification of the meaning of the term "abortion," including whether the Regulation purports to prohibit States from enforcing laws mandating access to contraception.

3.      As to the third count, for a declaration that the Regulation is unconstitutional and violates the Spending Clause because it is so vague as to fail to give the States, generally, and Plaintiffs, in particular, adequate notice as to what conduct it purports to prohibit.  This ambiguity prevents the States and their constitutional officers and other officials charged with enforcement of state laws from making a knowing choice whether to comply with the Regulation's restrictions or to forego federal funding;

4.      As to the fourth count, for a declaration that the Regulation is unconstitutional and violates the Spending Clause because it is not rationally related to the federal purpose for which the funds in the HHS appropriations act are appropriated;

5.      As to the fifth count, for a declaration that the Regulation is unconstitutional and violates the Spending Clause because the scope of the potential loss of federal funds is so great as to

leave the States with no choice but to comply with the federal restrictions; and, as such, the Regulation is unconstitutionally coercive;

6.      As to all counts, for preliminary and permanent injunctive relief enjoining the Defendants, and any persons acting on their behalf, from enforcing the provisions of the Regulation or from withholding federal funds appropriated under the HHS appropriations act from any state entity because of any alleged violations of the Regulation arising out of the States' enforcement of their contraception laws.

7.      In the alternative, as to the sixth count, for a declaration that States' enforcement of facially-neutral laws designed to protect the health and welfare of their residents do not contravene the Regulation;

8.      For costs of this suit; and

9.      For such other and further relief as the Court deems just and proper, including remand to HHS for further proceedings.

Respectfully submitted,

STATE OF CONNECTICUT;
NANCY WYMAN, in her official capacity
as Comptroller of the State of Connecticut;
KEVIN P. LEMBO, in his official capacity
as Healthcare Advocate of the State of
Connecticut.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____

Richard Blumenthal
Attorney General
Federal Bar No. CT05924
Robert W. Clark
Federal Bar No. CT18681
Maura Murphy Osborne
Federal Bar No. CT19987
Assistant Attorneys General
55 Elm Street
P.O. Box 120
Hartford, CT  06141-0120
Tel: (860) 808-5020
Fax: (860) 808-5347
Robert.Clark@po.state.ct.us
Maura.MurphyOsborne@po.state.ct.us

THE STATE OF ILLINOIS,
by and through its attorney,
LISA MADIGAN,
Attorney General of the State of Illinois,


*Brent Stratton*

Brent Stratton (ARDC #6188216)
Jennifer E. Smiley
(ARDC # 6275940)
Sean Morales-Doyle
Assistant Attorneys General
Office of the Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601
Tel: (312) 814-8309
Fax: (312) 814-4452
jsmiley@atg.state.il.us

COMMONWEALTH OF
MASSACHUSETTS,
by and through its attorney,
MARTHA COAKLEY,
Attorney General for the Commonwealth of
Massachusetts

*Maura T. Healey*

Maura T. Healey
State Bar No. 640856
Assistant Attorney General
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200
Fax: (617) 727-5762
maura.healey@state.ma.us

THE STATE OF CALIFORNIA,
by and through its attorney,
EDMUND G. BROWN JR.
Attorney General of the State of California


*Antonette Cordero*

Antonette Benita Cordero
Deputy Attorney General
State Bar No. 122112
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Telephone: (213) 897-2039
Fax: (213) 897-7605
Antonette.Cordero@doj.ca.gov

THE STATE OF NEW JERSEY
by and through its attorney,
ANNE MILGRAM,
Attorney General of New Jersey,


*Melissa Raksa*

Melissa H. Raksa
Assistant Attorney General
NJ019881994
Department of Law & Public Safety
25 Market Street
P.O. Box 080
Trenton, NJ 08625
609 292-8740
melissa.raksa@dol.lps.state.nj.us

THE STATE OF RHODE ISLAND

PATRICK C. LYNCH
Attorney General


*Brend Baum*
Patrick C. Lynch
Attorney General
Brenda D. Baum
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2294
Fax: (401) 222-3016
bbaum@riag.ri.gov

THE STATE OF OREGON
by and through its attorney,
JOHN R. KROGER,
Attorney General of the State of Oregon,


*Roger J. DeHoog*
Roger J. DeHoog
Senior Assistant  Attorney General
OSB # 93022
Oregon Department of Justice
Trial Division/Special Litigation Unit
1162 Court Street NE
Salem, OR 97301
Tel. (503) 947-4700
Fax (503) 947-4793
roger.dehoog@doj.state.or.us